IDA BURKLE *et al. v.* CHARLES H. ABRAHAM, *Exr., et al.*

(No. 7101)

Submitted March 24, 1932. Decided May 3, 1932.

*John P. Arbenz,* for appellants.
*O'Brien & O'Brien* and *Carl B. Galbraith,* for appellees.

LITZ, JUDGE:

This suit was brought November 1, 1928, by Ida Burkle and others as heirs at law of Wilhelmina Bach (widow of Bernard Bach) to set aside a deed, dated June 27, 1927, from Mrs. Bach to her son, William J. Bach, conveying to him all her real estate and household goods, on the ground that she was mentally incompetent to execute the instrument. William J. Bach having died testate pending the suit, the cause was revived against his personal representative, Charles Bach Abraham and Loretta Bach Abraham, his wife, as sole beneficiary under the will. From a decree, cancelling the deed, defendants have appealed.

Wilhelmina Bach died July 14, 1927, at the age of 80, after an illness of five or six weeks.

Testimony of witnesses for plaintiffs follows: Dr. John W. Pyles, a young physician, who attended Mrs. Bach almost daily from June 4th, until her death, testified in chief that he was of opinion that she was unfit mentally to transact business during the last week of June; predicating his conclusion on her mental and physical deterioration from old age, her apparent inability at times to remember, when he called in the evening, that he had visited her in the morning, her unreasonable answers to some of his questions, her apparent failure to recognize him sometimes, her unwillingness to remain in bed during the day, and her insistence, at times, that she had spent a restful night, that her appetite was good, and that she had not taken her medicine, when he had reason to disbelieve her statements. He admitted on cross-examination, however, that she would give satisfactory answers to questions repeated to her; that she never discussed business affairs with him; and that he could not recall whether he visited her the day the deed was executed. Mrs. Emma Hack, one of the plaintiffs, testified that she and her three sisters "took turns every day" visiting their mother during her last illness and helped with the house work; that "from May on" her mother would "just stare", and sometimes fail to answer questions, or to realize that she was at home. Mrs. Ida Burkle, another one of the plaintiffs, testified that she was

with her mother every evening from six until eleven o'clock for three weeks next preceding the execution of the deed; that Mrs. Bach "wasn't (then) in her right senses" and at times did not recognize the witness; that she was subject to "crying spells" and would call for her "baby" and want "to go home"; that she would go to the front door of the house dressed only in her night clothes; and that witness thought her mother incapable of understanding business transactions at the date of the deed. William T. Burkle, husband of Ida Burkle, testified that he saw Mrs. Bach two or three times a week during her last illness; that she would always call him the doctor; and that she had "a staring look" and would sometimes fail to answer questions. Marie Garrity, who lived next door to Mrs. Bach, testified in chief that she saw Mrs. Bach occasionally during the last three weeks of her life and sometimes thought her mental condition "was all right and other times it wasn't at all"; that answers made by Mrs. Bach to questions propounded to her were, sometimes, not responsive; and that Mrs. Bach often mistook witness for her (witness') mother. This witness admitted on cross-examination, however, that she merely spoke to Mrs. Bach when she saw her on the porch and never discussed business affairs with her. Agnes Garrity, sister to Marie Garrity, testified that she saw Mrs. Bach occasionally during the last three weeks of her life, at which times Mrs. Bach failed to recognize her or to talk coherently. Mrs. Anna Sprouse, mother of Marie and Agnes Garrity, testified in chief that William Bach lived with Mrs. Bach but that the daughters often came in to help with the house work; that she saw and talked with Mrs. Bach frequently just prior to her death; that Mrs. Bach complained to witness that her daughters never came to see her; and that on June 18, 1927, Mrs. Bach apparently did not know anything or anybody. On cross-examination she admitted there were times when Mrs. Bach would "perk up".

Defendants' witnesses testified as follows: Mrs. Elizabeth Morgan, a friend of Mrs. Bach, testified that she visited her several times during the last week in June, when she appeared to be of sound mind, and thoroughly able to conduct intelligent conversations; and that Mrs. Bach had told her she

intended to give her property to her son, William, because he had taken care of her. Mrs. Mary Albinger, a friend of Mrs. Bach since childhood, testified in chief that she saw her the first Sunday in July, 1927, and thought she had a sound mind and was competent to look after her business affairs. Mrs. W. R. Gaul, a neighbor of Mrs. Bach, testified that she talked with Mrs. Bach every day during her illness until within a week of her death, and she thought Mrs. Bach "had just as much sense as anybody"; and that she always called her "Mrs. Gaul". She admitted on cross-examination that she saw Mrs. Bach only once during the last three weeks of her illness, and did not then enter the house, but talked to her from the doorway. Mrs. Alberta Leonard, daughter of defendants, testified that she took Mrs. Bach a lunch almost daily during her last illness; that on these occasions, Mrs. Bach, when awake, talked as she had always; that she did not see her grandmother often during the week of her death, but was at her home the day the deed was executed. C. B. Rielly, Jr., who had known Mrs. Bach for twenty-five years, testified that he did plumbing work for her two or three weeks prior to her death; that she then told him she was going to leave her property to William Bach, and asked him to be a witness to her will; and that "she seemed perfectly sane" at that time. Mrs. Mary Neal testified that when she talked with Mrs. Bach five or six weeks prior to her death, she seemed to be of sound mind. Mrs. Evelyn Burkle, sister-in-law of Mrs. Ida Burkle, testified that when she visited Mrs. Bach June 17th, her mental condition seemed "all right". John P. Arbenz, a prominent attorney of Wheeling, who wrote the deed and witnessed its execution, testified that on being called to the home of Mrs. Bach in May, 1927, he drafted her will, which she then executed, devising one-half of her property to her son, William, and the remaining one-half equally to her other children; that he was again called to her home June 27th, to write a new will for her; that upon his arrival Mrs. Bach told him she wanted to leave all her property to William because he had taken care of her, and her daughters were attentive only when she became ill; that after fully discussing the matter with her, it was decided she would

make a deed conveying her real estate to William, subject to a life estate in her, and execute a new will distributing the rest of her estate equally among her other children, except Mrs. Rust, who, as Mrs. Bach said, had already been provided for; that while he was discussing with her the execution of the new will and the deed, Mrs. Ida Burkle came into the room, but at the request of her mother left immediately; that after the papers were drawn and executed, Mrs. Bach expressed her satisfaction and approval, saying that it was done just as she wanted it; and that she was on each occasion mentally well and fully capable of executing the instruments. Nell Moran, a former secretary to Arbenz, testified that on June 27th, she accompanied him to the home of Mrs. Bach (having been there with him in May when the first will was executed), who was ill in bed, but able to sit up while the new will and the deed were being discussed and written; that after the will and deed were written and read to Mrs. Bach by Arbenz, she said that was what she wanted; that at the request of Mrs. Bach, witness signed her name thereto as a subscribing witness, and, as a notary, took her acknowledgment to the deed; and that she considered Mrs. Bach to be of sound mind and competent to make the will and deed, basing her conclusion on the general demeanor of Mrs. Bach and the manner in which she answered questions and discussed the matters in hand.

Defendants rely especially upon the testimony of Arbenz and Miss Moran, who had peculiar opportunity to learn the condition of her mind, particularly with regard to her mental capacity to understand and execute the instrument in question. The time of the execution of the deed being the crucial time to be considered in determining the grantor's capacity to make the deed, the testimony of the scrivener, the notary, and subscribing witnesses to the deed is ordinarily entitled to peculiar weight. *Jarrett* v. *Jarrett,* 11 W. Va. 584; *Anderson* v. *Cranmer,* 11 W. Va. 562; *Nicholas* v. *Kershner,* 20 W. Va. 251; *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493; *Doak, Admr.* v. *Smith,* 93 W. Va. 133, 116 S. E. 691. But it is pointed out by counsel for plaintiffs that the scrivener in this case is the attorney for the parties seeking

to uphold the deed. Whether or not this fact should affect the weight of his testimony, we are of opinion that the evidence of the notary alone is amply sufficient to overcome the testimony of witnesses for plaintiffs, notwithstanding the failings of Mrs. Bach noted by the doctor. (We cannot, however, refrain from expressing our disapproval of an attorney appearing as counsel in a case in which he also testifies to facts, occuring prior to his employment, essential to his client's cause, a practice disapproved by both the national and the state bar associations.) Mere age or infirmity of mind and body is not suficient to overcome the legal presumption of mental capacity of the grantor. "A grantor in a deed may be extremely old, his understanding, memory, and mind enfeebled and weakened by age, and his action occasionally strange and eccentric, and he may not be able to transact many affairs of life, yet if age has not rendered him imbecile, so that he does not know the nature and effect of the deed, this does not invalidate the deed. If he be capable, at the time, to know the nature, character, and effect of the particular act, that is sufficient to sustain it." *Buckey* v. *Buckey et al.*, 38 W. Va. 168, 18 S. E. 383.

The judgment of the circuit court is reversed and the bill dismissed.

*Reversed and dismissed.*

WOODS, JUDGE, (concurring):

While in accord with the holding, I do not share in the parenthetical note in the opinion, which expresses disapproval of the action of one of counsel in taking the witness stand. I am of opinion that the rule of legal ethics alluded to has no application here. The attorney concerned had for years been the confidential adviser of the aged woman (as well as her husband, who predeceased her), and was only doing what he conceived to be his duty in carrying out her wishes by upholding the will. No rule can be so comprehensive as to govern every particular case. Being unable to say that the attorney's interpretation of the rule was in any degree an intended or technical violation, I voice a dissent to the extent indicated.